RECEIVED

August 19, 2020

At: 8:30_____.m

WILLIAM T. WALSH

CLERK

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CASE NO. 20-707 (MAS)** |
| **THE BANK OF NOVA SCOTIA,** | |
| **Defendant.** | |

## DEFERRED PROSECUTION AGREEMENT

Defendant The Bank of Nova Scotia (the "Company"), pursuant to authority granted by the Company's Board of Directors reflected in Attachment B, and the United States Department of Justice, Criminal Division, Fraud Section, and the United States Attorney's Office for the District of New Jersey (collectively, the "Fraud Section and the Office"), enter into this deferred prosecution agreement (the "Agreement").

### Criminal Information and Acceptance of Responsibility

1.      The Company acknowledges and agrees that the Fraud Section and the Office will file the attached two-count criminal Information in the United States District Court for the District of New Jersey charging the Company with wire fraud, in violation of Title 18, United States Code, Section 1343, and attempted price manipulation, in violation of Title 7, United States Code, Section 13(a)(2).  In so doing, the Company: (a) knowingly waives any right it may have to indictment on these charges, as well as all rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) knowingly waives any objection with respect to venue to any charges by the United States arising out of the conduct described in the Statement of Facts attached hereto as Attachment A (the "Statement of Facts") and consents to the filing of the Information,

-1-

as provided under the terms of this Agreement, in the United States District Court for the District of New Jersey.  The Fraud Section and the Office agree to defer prosecution of the Company pursuant to the terms and conditions described below.

2.     The Company admits, accepts, and acknowledges that it is responsible under United States law for the acts of its officers, directors, employees, and agents as charged in the Information, and as set forth in the Statement of Facts, and that the allegations described in the Information and the facts described in the Statement of Facts are true and accurate.  The Company agrees that, effective as of the date the Company signs this Agreement, in any prosecution that is deferred by this Agreement, it will not dispute the Statement of Facts set forth in this Agreement, and, in any such prosecution, the Statement of Facts shall be admissible as: (a) substantive evidence offered by the government in its case-in-chief and rebuttal case; (b) impeachment evidence offered by the government on cross-examination; and (c) evidence at any sentencing hearing or other hearing.  In addition, in connection therewith, the Company agrees not to assert any claim under the United States Constitution, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, Section 1B1.1(a) of the United States Sentencing Guidelines, or any other federal rule that the Statement of Facts should be suppressed or is otherwise inadmissible as evidence in any form.

<u>**Term of the Agreement**</u>

3.     This Agreement is effective for a period beginning on the date on which the Information is filed and ending three years from the later of the date on which the Information is filed or the date on which the independent compliance monitor (the "Monitor") is retained by the Company, as described in Paragraphs 21-24 below (the "Term").  The Company agrees, however, that, in the event the Fraud Section and the Office determine, in their sole discretion, that the

Company has knowingly violated any provision of this Agreement or has failed to completely perform or fulfill each of the Company's obligations under this Agreement, an extension or extensions of the Term may be imposed by the Fraud Section and the Office, in their sole discretion, for up to a total additional time period of one year, without prejudice to the Fraud Section and the Office's right to proceed as provided in Paragraphs 27-30 below.  Any extension of the Agreement extends all terms of this Agreement, including the terms of the monitorship in Attachment D, for an equivalent period.  Conversely, in the event the Fraud Section and the Office find, in their sole discretion, that there exists a change in circumstances sufficient to eliminate the need for the monitorship in Attachment D, and that the other provisions of this Agreement have been satisfied, the Agreement may be terminated early.

### Relevant Considerations

4.       The Fraud Section and the Office enter into this Agreement based on the individual facts and circumstances presented by this case and the Company, including:

a.       the nature and seriousness of the offense conduct, which is described in the Statement of Facts attached hereto as Attachment A ("Statement of Facts") and involved thousands of instances of unlawful trading in precious metals futures contracts by four traders on three continents between approximately January 2008 and July 2016, resulting in approximately $6,622,190 of loss to other futures market participants and significant harm to the integrity of core United States commodities markets, as well as harm to participants in correlated markets, including securities such as precious metals-based exchange-traded funds;

b.       during the period covered by the Statement of Facts (*i.e.*, between approximately January 2008 and July 2016), the Company's compliance function,

especially as it related to trade surveillance, failed to detect and deter the four traders' unlawful trading practices. In addition, between approximately August 2013 and February 2016, three compliance officers had substantial information regarding unlawful trading by one of the traders identified in the Statement of Facts, but failed to stop that activity and thus contributed to the offense conduct;

c.      the Company did not receive voluntary disclosure credit because it did not voluntarily and timely disclose to the Fraud Section and the Office the conduct described in the Statement of Facts;

d.      in 2016, after the Company's futures commission merchant flagged trading by Corey Flaum (one of the precious metals traders identified in the Statement of Facts) for possible spoofing, the Company made a voluntary disclosure regarding Flaum to the United States Commodity Futures Trading Commission ("CFTC"). As a result of recordkeeping failures, however, the Company's disclosure to the CFTC was materially incomplete because, among other things, the Company incorrectly represented to the CFTC that Flaum had used only a single trader ID ("Tag50")–"CCCFLAUM"–during the period relevant to the CFTC's investigation. In fact, Flaum had used another Tag50 while employed at the Company— "CFLAUM"—to engage in unlawful trading on thousands of occasions, during and prior to the period relevant to the CFTC's investigation. As a result, the CFTC was unable to fully investigate Flaum's unlawful trading and was prevented from discovering its true extent. As a result of the Company's incomplete disclosure, and inaccurate representations on which the CFTC relied, the CFTC and the Company entered into a resolution that did not reflect the full extent of Flaum's spoofing (the "2018 CFTC

Resolution"), and the Company received a substantially-reduced penalty from the CFTC in recognition of, among other things, its self-reporting;

e.      the Company received credit for its cooperation with the Fraud Section and the Office's investigation, including voluntarily making a foreign-based employee available for an interview in the United States, producing documents to the Fraud Section and the Office from foreign countries in ways that did not implicate foreign data privacy laws, and proactively identifying for the Fraud Section and the Office important documents and information even when those documents and information were not favorable to the Company;

f.      since the period covered by the Statement of Facts, the Company has engaged in remedial measures, including nearly doubling its annual compliance operating budget and adding more than 200 full-time equivalent compliance positions; hiring and promoting compliance personnel with the necessary experience and skills; improving the Company's compliance technology infrastructure; and implementing industry-standard trade surveillance tools.  The Company also is in the process of winding down its precious metals business;

g.      the Company has enhanced and has committed to continuing to enhance its compliance program and internal controls, including ensuring that its compliance program satisfies the minimum elements set forth in Attachment C to this Agreement (Corporate Compliance Program);

h.      accordingly, after considering (a) through (g) above, and principally the Company's failure to have, at the time of the offense conduct (i.e., approximately January 2008 and July 2016), an effective compliance program and the role of certain of the

Company's now-former compliance officers in the offense conduct, the Company received a fine at the top of the applicable Sentencing Guidelines fine range for the purposes of calculating the appropriate Criminal Monetary Penalty under this Agreement;

i.       based on the role of the Company's compliance function in contributing to the offense conduct, and given that the Company's remedial improvements to its compliance program and internal controls have not been fully implemented and tested to demonstrate that they would prevent and detect similar misconduct in the future, the Fraud Section and the Office determined that an independent compliance monitor was necessary;

j.       the Company has no prior criminal history;

k.       the Company has agreed to continue to cooperate with the Fraud Section and the Office as described in Paragraph 5 below; and

l.       the Company has agreed to enter into separate resolutions with the CFTC relating to: (i) the conduct described in the Statement of Facts; (ii) false statements the Company made to the CFTC (including in connection with the investigation that resulted in the 2018 CFTC Resolution), Commodity Exchange, Inc. ("COMEX"), and the National Futures Association ("NFA"); and (iii) various issues relating to the Company's swap-dealer business (the "Swap Dealer Resolution").

## Future Cooperation and Disclosure Requirements

5.       The Company shall cooperate fully with the Fraud Section and the Office in any and all matters relating to the conduct described in this Agreement and the attached Statement of Facts and to other conduct in violation of (i) the Commodity Exchange Act, Title 7, United States Code, Section 1, *et seq*.; (ii) as it applies to commodities trading, the wire fraud statute, Title 18, United States Code, Section 1343; and (iii) the commodities fraud statute, Title 18, United States

Code, Section 1348 (collectively, the "Commodities Laws") that are under investigation by the Fraud Section and the Office until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the term specified in Paragraph 3. At the request of the Fraud Section and the Office, the Company shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies in any investigation of the Company, its affiliates, or any of its present or former officers, directors, employees, and agents in any and all matters relating to the conduct described in this Agreement and the attached Statement of Facts and other conduct related to violations of the Commodities Laws. The Company's cooperation pursuant to this Paragraph is subject to applicable law and regulations, as well as valid claims of attorney-client privilege or attorney work product doctrine; however, the Company must provide to the Fraud Section and the Office a log of any information or cooperation that is not provided based on an assertion of law, regulation, or privilege, and the Company bears the burden of establishing the validity of any such an assertion. The Company agrees that its cooperation pursuant to this paragraph shall include, but not be limited to, the following:

    a.    The Company shall truthfully disclose all factual information with respect to its activities and those of its present and former directors, officers, employees, agents, and consultants, including any evidence or allegations and internal or external investigations, about which the Company has any knowledge or about which the Fraud Section and the Office may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Company to provide to the Fraud Section and the Office, upon request, any document, record or other tangible evidence about which the Fraud Section and the Office may inquire of the Company.

b.      Upon request of the Fraud Section and the Office, the Company shall designate knowledgeable employees, agents, or attorneys to provide to the Fraud Section and the Office the information and materials described in Paragraph 5(a) above on behalf of the Company.  It is further understood that the Company must at all times provide complete, truthful, and accurate information.

c.      The Company shall use its best efforts to make available for interviews or testimony, as requested by the Fraud Section and the Office, present or former officers, directors, employees, agents, and consultants of the Company.  This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and regulatory authorities. Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Company, may have material information regarding the matters under investigation.

d.      With respect to any information, testimony, documents, records, or other tangible evidence provided to the Fraud Section and the Office pursuant to this Agreement, the Company consents to any and all disclosures to other governmental authorities, including United States authorities and those of a foreign government of such materials as the Fraud Section and the Office, in their sole discretion, shall deem appropriate.

6.      In addition to the obligations in Paragraph 5, during the Term, should the Company learn of any evidence or allegation of conduct which may constitute a violation of the Commodities Laws, the Company shall promptly report such evidence or allegation to the Fraud Section and the Office.

## Total Criminal Monetary Amount

7.      The Company, the Fraud Section, and the Office agree that the Total Criminal Monetary Amount to be paid by the Company pursuant to this Agreement is $60,451,102, which is comprised of the following components set forth below: (1) a Criminal Monetary Penalty of $42,000,000; (2) a Criminal Disgorgement Amount of $11,828,912; and (3) a Victim Compensation Payment Amount of $6,622,190.

8.      The Fraud Section and the Office agree that up to half of the Criminal Monetary Penalty (*i.e.*, $21,000,000) may be offset by the amount of any payment made by the Company pursuant to the August 19, 2020 order and settlement between the Company and the CFTC relating to the conduct described in the attached Statement of Facts.

9.      The Company acknowledges that no tax deduction may be sought in connection with the payment of any of the components of the Total Criminal Monetary Amount.  The Company shall not seek or accept directly or indirectly reimbursement or indemnification from any source with regard to the Total Criminal Monetary Amount or any other agreement entered into with an enforcement authority or a regulator, including the CFTC, concerning the facts set forth in the Statement of Facts.

## Payment of Criminal Monetary Penalty

10.      The Fraud Section, the Office, and the Company agree that application of the United States Sentencing Guidelines ("USSG" or "Sentencing Guidelines") to determine the applicable fine range yields the following analysis:

a.      The 2018 USSG are applicable to this matter.

b. <u>Offense Level</u>.  Based upon USSG § 2B1.1, the total offense level is 29, calculated as follows:

| (a)(1) | Base Offense Level | 7 |
|---|---|---|
| (b)(1)(J) | Loss of More Than $3,500,000 | +18 |
| (b)(2)(A)(i) | More Than 10 Victims | +2 |
| (b)(10) | Sophisticated Means | +2 |
| **TOTAL** | | 29 |

c. <u>Base Fine</u>.  Based upon USSG § 8C2.4(a)(1), the base fine is $15,000,000 (the fine indicated in the Offense Level Fine Table)

d. <u>Culpability Score</u>.  Based upon USSG § 8C2.5, the culpability score is 7, calculated as follows:

| (a) | Base Culpability Score | 5 |
|---|---|---|
| (b)(2)(B)(i) | The relevant unit had 1,000 or more employees and an individual within high-level personnel of the unit participated in, condoned, or was willfully ignorant of the offense | +4 |
| (g)(2) | The organization cooperated in the investigation, and clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct | -2 |
| **TOTAL** | | 7 |

<u>Calculation of Fine Range</u>:

| | |
|---|---|
| Base Fine | $15,000,000 |
| Multipliers (USSG § 8C2.6) | 1.4 (min) / 2.8 (max) |
| Fine Range | $21,000,000 / $42,000,000 |

11. The Company agrees to pay a criminal monetary penalty in the amount of $42,000,000 (hereafter, the "Criminal Monetary Penalty") to the United States Treasury no later

than ten (10) business days after the Agreement is fully executed pursuant to payment instructions provided by the Fraud Section and the Office in their sole discretion.  The Fraud Section, the Office, and the Company agree that this Criminal Monetary Penalty is appropriate given the facts and circumstances of this case, including the Relevant Considerations described in Paragraph 4.

12.     The Criminal Monetary Penalty is final and shall not be refunded.  Furthermore, nothing in this Agreement shall be deemed an agreement by the Fraud Section and the Office that $42,000,000 is the maximum penalty that may be imposed in any future prosecution, and the Fraud Section and the Office are not precluded from arguing in any future prosecution that the Court should impose a higher fine, although the Fraud Section and the Office agree that under those circumstances, they will recommend to the Court that any amount paid under this Agreement should be offset against any fine the Court imposes as part of a future judgment.

## Payment of Criminal Disgorgement Amount

13.     The Company hereby agrees to disgorge to the United States the sum of $11,828,912 (the "Criminal Disgorgement Amount"), and further to pay the Criminal Disgorgement Amount into the United States Postal Inspection Service Consumer Fraud Fund ("USPISCFF").  The Criminal Disgorgement Amount has been calculated by the Fraud Section and the Office based on the unlawful trading profits for the conduct described in the Statement of Facts, as well as the overall profits earned by Flaum in certain years (namely, years distinguished by a high volume of spoof orders).  The Company shall pay the Criminal Disgorgement Amount into the USPISCFF no later than ten (10) business days after the Agreement is fully executed, pursuant to payment instructions provided by the Fraud Section and the Office in their sole discretion.

14.     The Criminal Disgorgement Amount paid is final and shall not be refunded should the Fraud Section and the Office later determine that the Company has breached this Agreement and commence a prosecution against the Company.  In the event of a breach of this Agreement and subsequent prosecution, the Fraud Section and the Office may pursue additional civil and criminal forfeiture in excess of the Criminal Disgorgement Amount. The Fraud Section and the Office agree that in the event of a subsequent breach and prosecution, they will recommend to the Court that the amounts paid pursuant to this Agreement be offset against whatever forfeiture the Court shall impose as part of its judgment.  The Company understands that such a recommendation will not be binding on the Court.

### Payment of Victim Compensation Amount

15.     The Company agrees to pay the amount of $6,622,190 in order to compensate victims for their losses as set forth in Paragraph 4(a) above (hereafter, the "Victim Compensation Amount").  The Company shall pay the full Victim Compensation Amount to the United States no later than ten (10) business days after the Agreement is signed pursuant to payment instructions provided by the Fraud Section and the Office in their sole discretion.

16.     The Fraud Section and the Office shall serve as the claims administrator for making victim compensation payments and shall have sole discretion to determine how the Victim Compensation Amount will be disbursed.

17.     The Company agrees that any part of the Victim Compensation Amount that remains unclaimed twelve (12) months after the execution of this Agreement shall revert to the United States in the form of an additional Criminal Monetary Penalty.

**Conditional Release from Liability**

18.     Subject to Paragraphs 27-30, the Fraud Section and the Office agree, except as provided in this Agreement, that they will not bring any criminal or civil case against the Company relating to any of the conduct described in the attached Statement of Facts, the criminal Information filed pursuant to this Agreement, or any conduct on the Company's precious metals desk relating to placing orders with no intent to execute in connection with futures trading during the Relevant Period as defined in the Statement of Facts.  The Fraud Section and the Office, however, may use any information related to the conduct described in the attached Statement of Facts against the Company:  (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code.

a.     This Agreement does not provide any protection against prosecution for any future conduct by the Company.

b.     In addition, this Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with the Company.

**Corporate Compliance Program**

19.     The Company represents that it has implemented and will continue to implement a compliance and ethics program designed to prevent and detect violations of the Commodities Laws throughout its operations, including those of its affiliates, agents, and joint ventures (to the extent the company manages or controls such joint ventures) and those of its contractors and subcontractors whose responsibilities relate to commodities trading or supervision of commodities trading, including, but not limited to, the minimum elements set forth in Attachment C.

20. In order to address any deficiencies in its internal controls, policies, and procedures, the Company represents that it has undertaken, and will continue to undertake in the future, in a manner consistent with all of its obligations under this Agreement, a review of its existing controls (including its trade surveillance tools), policies, and procedures regarding compliance with the Commodities Laws. Where necessary and appropriate, the Company agrees to adopt a new compliance program, or to modify its existing one, including internal controls, compliance policies, and procedures in order to ensure that it maintains an effective compliance program, including a system of internal controls, designed to effectively detect and deter violations of the Commodities Laws. The compliance program, including the internal controls system, will include, but not be limited to, the minimum elements set forth in Attachment C. In assessing the Company's compliance program, the Fraud Section and the Office, in their sole discretion, may consider the Monitor's certification decision as described in Paragraph 19 of Attachment D.

## Independent Compliance Monitor

21. Promptly after the Fraud Section's selection pursuant to Paragraph 23 below, the Company agrees to retain a Monitor for the term specified in Paragraph 24. The Monitor's duties and authority, and the obligations of the Company with respect to the Monitor, the Fraud Section, and the Office are set forth in Attachment D, which is incorporated by reference into this Agreement. Within twenty (20) business days after the date of execution of this Agreement, the Company shall submit a written proposal identifying the monitor candidates, and, at a minimum, providing the following:

a. a description of each candidate's qualifications and credentials in support of the evaluative considerations and factors listed below;

-14-

b.    a written certification by the Company that it will not employ or be affiliated with the Monitor for a period of not less than two years from the date of the termination of the monitorship;

c.    a written certification by each of the candidates that he/she is not a current or recent (*i.e.*, within the prior two years) employee, agent, or representative of the Company and holds no interest in, and has no relationship with, the Company, its subsidiaries, affiliates, or related entities, or its employees, officers, or directors;

d.    a written certification by each of the candidates that he/she has notified any clients that the candidate represents in a matter involving the Fraud Section or the Office (or any other Department component) handling the monitor selection process, and that the candidate has either obtained a waiver from those clients or has withdrawn as counsel in the other matter(s); and

e.    a statement identifying the monitor candidate that is the Company's first, second, and third choice to serve as the Monitor.

22.    The monitor candidates or their team members shall have, at a minimum, the following qualifications:

a.    demonstrated expertise with respect to the Commodities Laws;

b.    experience designing and/or reviewing corporate compliance policies, procedures, and internal controls, including detective controls such as trade surveillance and electronic communication surveillance;

c.    the ability to access and deploy resources as necessary to discharge the Monitor's duties as described in the Agreement; and

   d.  sufficient independence from the Company to ensure effective and impartial performance of the Monitor's duties as described in the Agreement.

23. The Fraud Section and the Office retain the right, in their sole discretion, to choose the Monitor from among the candidates proposed by the Company.  Any submission or selection of a monitor candidate by either the Company, the Fraud Section, or the Office should be made without unlawful discrimination against any person or class of persons.  If the Fraud Section and the Office determine, in their sole discretion, that any or all of the three candidates lack the requisite qualifications, they shall notify the Company and request that the Company propose another candidate or candidates within twenty (20) business days.  This process shall continue until a Monitor acceptable to both parties is chosen.  The Fraud Section, the Office, and the Company will use their best efforts to complete the selection process within sixty (60) calendar days of the execution of this Agreement.  The Fraud Section and the Office retain the right to determine that the Monitor should be removed if, in the Fraud Section and the Office's sole discretion, the Monitor fails to conduct the monitorship effectively, fails to comply with this Agreement, or no longer meets the qualifications outlined in Paragraph 22 above.  If the Monitor resigns, is removed, or is otherwise unable to fulfill his or her obligations as set out herein and in Attachment D, the Company shall within twenty (20) business days recommend a pool of three qualified Monitor candidates from which the Fraud Section and the Office will choose a replacement, following the process outlined above.

24. The Monitor's term shall be three years from the date on which the Monitor is retained by the Company, subject to extension or early termination as described in Paragraph 3. The Monitor's powers, duties, and responsibilities, as well as additional circumstances that may support an extension of the Monitor's term, are set forth in Attachment D.  The Company agrees

that it will not employ or be affiliated with the Monitor or the Monitor's firm for a period of not less than two years from the date on which the Monitor's term expires.  Nor will the Company discuss with the Monitor or the Monitor's firm the possibility of further employment or affiliation during the Monitor's term.  Upon agreement by the parties, this prohibition will not apply to other monitorship responsibilities that the Monitor or the Monitor's firm may undertake in connection with resolutions with foreign or other domestic authorities.

### Deferred Prosecution

25.     In consideration of the undertakings agreed to by the Company herein, the Fraud Section and the Office agree that any prosecution of the Company for the conduct set forth in the attached Statement of Facts be and hereby is deferred for the Term.  To the extent there is conduct disclosed by the Company that is not set forth in the attached Statement of Facts, such conduct will not be exempt from further prosecution and is not within the scope of or relevant to this Agreement.

26.     The Fraud Section and the Office further agree that if the Company fully complies with all of its obligations under this Agreement, the Fraud Section and the Office will not continue the criminal prosecution against the Company described in Paragraph 1 and, at the conclusion of the Term, this Agreement shall expire.  Six months after the Agreement's expiration, the Fraud Section and the Office shall seek dismissal with prejudice of the criminal Information filed against the Company described in Paragraph 1, and agree not to file charges in the future against the Company based on the conduct described in this Agreement and the attached Statement of Facts.

### Breach of the Agreement

27.     If, during the Term, the Company (a) commits any felony under U.S. federal law; (b) provides in connection with this Agreement deliberately false, incomplete, or misleading

-17-

information, including in connection with its disclosure of information about individual culpability; (c) fails to cooperate as set forth in Paragraphs 5 and 6 of this Agreement; (d) fails to implement a compliance program as set forth in Paragraphs 19-20 of this Agreement and Attachment C; or (e) otherwise fails to completely perform or fulfill each of the Company's obligations under the Agreement, regardless of whether the Fraud Section and the Office become aware of such a breach after the Term is complete, the Company shall thereafter be subject to prosecution for any federal criminal violation of which the Fraud Section and the Office have knowledge, including, but not limited to, the charges in the Information described in Paragraph 1, which may be pursued by the Fraud Section and the Office in the United States District Court for the District of New Jersey or any other appropriate venue.  Determination of whether the Company has breached the Agreement and whether to pursue prosecution of the Company shall be in the sole discretion of the Fraud Section and the Office.  Any such prosecution may be premised on information provided by the Company or its personnel.  Any such prosecution relating to the conduct described in the attached Statement of Facts or relating to conduct known to the Fraud Section and the Office prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Company, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term plus one year.  Thus, by signing this Agreement, the Company agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus one year.  In addition, the Company agrees that the statute of limitations as to any violation of the Commodities Laws that occurs during the Term will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Fraud Section and the Office

-18-

are made aware of the violation or the duration of the Term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

28.     In the event the Fraud Section and the Office determine that the Company has breached this Agreement, the Fraud Section and the Office agree to provide the Company with written notice of such breach prior to instituting any prosecution resulting from such breach. Within thirty days of receipt of such notice, the Company shall have the opportunity to respond to the Fraud Section and the Office in writing to explain the nature and circumstances of such breach, as well as the actions the Company has taken to address and remediate the situation, which explanation the Fraud Section and the Office shall consider in determining whether to pursue prosecution of the Company.

29.     In the event that the Fraud Section and the Office determine that the Company has breached this Agreement:  (a) all statements made by or on behalf of the Company to the Fraud Section, the Office, or to the Court, including the attached Statement of Facts, and any testimony given by the Company before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Fraud Section and the Office against the Company; and (b) the Company shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, Section 1B1.1(a) of the United States Sentencing Guidelines, or any other federal rule that any such statements or testimony made by or on behalf of the Company prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible.  The decision whether conduct or statements of any current director,

officer, or employee, or any person acting on behalf of, or at the direction of, the Company, will be imputed to the Company for the purpose of determining whether the Company has violated any provision of this Agreement shall be in the sole discretion of the Fraud Section and the Office.

30.    The Company acknowledges that the Fraud Section and the Office have made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Company breaches this Agreement and this matter proceeds to judgment.  The Company further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

31.    On the date that the period of deferred prosecution specified in this Agreement expires, the Company, by the Chief Executive Officer of the Company and the Chief Financial Officer of the Company, will submit the certification set forth in Attachment E and certify to the Fraud Section and the Office that the Company has met its disclosure obligations pursuant to Paragraph 6 of this Agreement.  Each certification will be deemed a material statement and representation by the Company to the executive branch of the United States for purposes of Title 18, United States Code, Sections 1001 and 1519, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

**Sale, Merger, or Other Change in Corporate Form of Company**

32.    Except as may otherwise be agreed by the parties in connection with a particular transaction, the Company agrees that in the event that, during the Term, it undertakes any change in corporate form, including if it sells, merges, or transfers business operations that are material to the Company's consolidated operations, or to the operations of any subsidiaries or affiliates involved in the conduct described in the attached Statement of Facts, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other

-20-

change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement.  The purchaser or successor in interest must also agree in writing that the ability of the Fraud Section and the Office to breach under this Agreement is applicable in full force to that entity.  The Company agrees that the failure to include these provisions in the transaction will make any such transaction null and void.  The Company shall provide notice to the Fraud Section and the Office at least thirty days prior to undertaking any such sale, merger, transfer, or other change in corporate form.  The Fraud Section and the Office shall notify the Company prior to such transaction (or series of transactions) if it determines that the transaction(s) will have the effect of circumventing or frustrating the enforcement purposes of this Agreement.  If at any time during the Term the Company engages in a transaction(s) that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, the Fraud Section and the Office may deem it a breach of this Agreement pursuant to Paragraphs 27-30 of this Agreement.  Nothing herein shall restrict the Company from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Fraud Section and the Office.

## Public Statements by Company

33.     The Company expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents, or any other person authorized to speak for the Company make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Company set forth above or the facts described in the attached Statement of Facts.  Any

such contradictory statement shall, subject to cure rights of the Company described below, constitute a breach of this Agreement, and the Company thereafter shall be subject to prosecution as set forth in Paragraphs 27-30 of this Agreement.  The decision whether any public statement by any such person contradicting a fact contained in the attached Statement of Facts will be imputed to the Company for the purpose of determining whether it has breached this Agreement shall be at the sole discretion of the Fraud Section and the Office.  If the Fraud Section and the Office determine that a public statement by any such person contradicts in whole or in part a statement contained in the attached Statement of Facts, the Fraud Section and the Office shall so notify the Company, and the Company may avoid a breach of this Agreement by publicly repudiating such statement(s) within five business days after notification.  The Company shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the attached Statement of Facts provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the attached Statement of Facts.  This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Company in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Company.

34.    The Company agrees that if it, or any of its direct or indirect subsidiaries or affiliates, issues a press release or holds any press conference in connection with this Agreement, the Company shall first consult with the Fraud Section and the Office to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Fraud Section and the Office and the Company; and (b) whether the Fraud Section and the Office have any objection to the release.

35.     The Fraud Section and the Office agree, if requested to do so, to bring to the attention of law enforcement and regulatory authorities the facts and circumstances relating to the nature of the conduct underlying this Agreement, including the nature and quality of the Company's cooperation and remediation.   By agreeing to provide this information to such authorities, the Fraud Section and the Office are not agreeing to advocate on behalf of the Company, but rather are agreeing to provide facts to be evaluated independently by such authorities.

## Limitations on Binding Effect of Agreement

36.     This Agreement is binding on the Company, the Fraud Section, and the Office but specifically does not bind any other component of the Department of Justice, other federal agencies, or any state, local or foreign law enforcement or regulatory agencies, or any other authorities, although the Fraud Section and the Office will bring the cooperation of the Company and its compliance with its other obligations under this Agreement to the attention of such agencies and authorities if requested to do so by the Company.   If the court refuses to grant exclusion of time under the Speedy Trial Act, 18 U.S.C. § 3161(h)(2), all the provisions of this Agreement shall be deemed null and void, and the Term shall be deemed to have not begun, except that the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts shall be tolled from the date on which this Agreement is signed until the date the Court refuses to grant the exclusion of time plus six months.

## Notice

37.     Any notice to the Fraud Section and the Office under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to Brian Kidd, Deputy Chief, Fraud Section, Criminal Division, United States

Department of Justice, 1400 New York Avenue NW, Washington, DC, 20005. Any notice to the Company under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to Ian Arellano, Executive Vice President and General Counsel, The Bank of Nova Scotia, 40 King Street West, 8th Floor, Toronto, Ontario, Canada, M5H 1H1. Notice shall be effective upon actual receipt by the Fraud Section and the Office or the Company.

### **Complete Agreement**

38.     This Agreement, including its attachments, sets forth all the terms of the agreement between the Company, the Fraud Section, and the Office. No amendments, modifications, or additions to this Agreement shall be valid unless they are in writing and signed by the Fraud Section and the Office, the attorneys for the Company, and a duly authorized representative of the Company.

**AGREED:**

**FOR THE BANK OF NOVA SCOTIA:**

Date:  August 13, 2020                    By:  _____
                                               Ian Arellano
                                               The Bank of Nova Scotia


Date: August 13, 2020                     By:  _____
                                               Kenneth M. Raisler
                                               Kathleen S. McArthur
                                               SULLIVAN & CROMWELL LLP

-24-

**FOR THE DEPARTMENT OF JUSTICE:**

ROBERT A. ZINK
Chief, Fraud Section
Criminal Division
United States Department of Justice

Date: 8/19/20                    By:

Avi Perry, Assistant Chief
Matthew F. Sullivan, Trial Attorney
Alexander Kramer, Trial Attorney

CRAIG CARPENITO
United States Attorney
District of New Jersey

Date: 8/19/20                    By:

Catherine R. Murphy
Assistant United States Attorney

-25-

## COMPANY OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with outside counsel for The Bank of Nova Scotia (the "Company").  I understand the terms of this Agreement and voluntarily agree, on behalf of the Company, to each of its terms.  Before signing this Agreement, I consulted outside counsel for the Company.  Counsel fully advised me of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of this Agreement with the Board of Directors of the Company.  I have advised and caused outside counsel for the Company to advise the Board of Directors fully of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement.  Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of the Company, in any way to enter into this Agreement.  I am also satisfied with outside counsel's representation in this matter.  I certify that I am the Executive Vice President and General Counsel for the Company and that I have been duly authorized by the Company to execute this Agreement on behalf of the Company.

Date: August 13, 2020

THE BANK OF NOVA SCOTIA

By:

Ian Arellano
Executive Vice President and
General Counsel

## CERTIFICATE OF COUNSEL

I am counsel for The Bank of Nova Scotia (the "Company" in the matter covered by this Agreement.  In connection with such representation, I have examined relevant Company documents and have discussed the terms of this Agreement with the Company Board of Directors. Based on our review of the foregoing materials and discussions, I am of the opinion that the representative of the Company has been duly authorized to enter into this Agreement on behalf of the Company and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of the Company and is a valid and binding obligation of the Company.  Further, I have carefully reviewed the terms of this Agreement with the Board of Directors and the Executive Vice President and General Counsel of the Company, Ian Arellano.  I have fully advised them of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement.  To my knowledge, the decision of the Company to enter into this Agreement, based on the authorization of the Board of Directors, is an informed and voluntary one.

Date: August 13, 2020

By: _____
          Kenneth M. Raisler
          Kathleen S. McArthur
          SULLIVAN & CROMWELL LLP
          Counsel for The Bank of Nova Scotia

**ATTACHMENT A**

**STATEMENT OF FACTS**

1.      The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the United States Department of Justice, Criminal Division, Fraud Section, and the United States Attorney's Office for the District of New Jersey (collectively, the "Fraud Section and the Office") and The Bank of Nova Scotia (the "Company").   The Company hereby agrees and stipulates that the following information is true and accurate.   The Company admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below.   Should the Fraud Section and the Office pursue the prosecution that is deferred by this Agreement, the Company agrees that it will neither contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding.   The following facts establish beyond a reasonable doubt the charges set forth in the criminal Information attached to this Agreement:

<u>Unlawful Trading Practices</u>

2.      Between approximately January 2008 and July 2016 (the "Relevant Period"), four precious metals traders employed by the Company engaged in fraudulent and manipulative trading practices in connection with the purchase and sale of gold, silver, platinum, and palladium futures contracts (collectively, "precious metals futures contracts") on and subject to the rules of a registered entity, specifically the New York Mercantile Exchange, Inc. and Commodity Exchange, Inc., which were exchanges operated by the CME Group, Inc. ("CME Group").   The four traders, who each acted independently, were (a) Corey Flaum, who was based in New York; (b) Trader 2, who was also based in New York; (c) Trader 3, who was based in London; and

(d) Trader 4, who was based in New York until 2012, and thereafter was based in Hong Kong (collectively, the "Subject Traders").

3.  On thousands of occasions, the Subject Traders, principally Flaum, knowingly and intentionally attempted to manipulate the prices of precious metals futures contracts, and attempted to profit by deceiving other market participants through false and fraudulent pretenses and representations concerning the existence of genuine supply and demand for precious metals futures contracts.  This conduct primarily involved gold and silver futures contracts, but the conduct of Flaum and Trader 4, at times, also involved platinum and palladium futures contracts.

4.  More specifically, the Subject Traders placed thousands of orders to buy and sell precious metals futures contracts with the intent to cancel those orders before execution (the "Manipulative Orders").  These Manipulative Orders were intended to artificially move the prices of precious metals futures contracts in a direction that was favorable to the Subject Traders, and to inject false and misleading information into the precious metals futures markets in order to deceive other market participants into believing something untrue, namely that the visible order book accurately reflected market-based forces of supply and demand.  This false and misleading information was intended to, and at times did, trick other market participants into reacting to the apparent change and imbalance in supply and demand by buying and selling futures contracts at quantities, prices, and times that they otherwise likely would not have traded.

5.  The Subject Traders had various techniques for placing Manipulative Orders. Often, a Manipulative Order took the form of a single, relatively large order in the top half of the visible order book that was canceled soon after its placement.  As one example of this technique, on December 31, 2015, at approximately 11:39:10.679 a.m. (CST), Flaum placed a genuine order to sell five gold futures contracts at the price of $1,060.40.  Approximately 82.987 seconds later,

Flaum placed a Manipulative Order to buy 245 gold futures contracts at the price of $1,059.90 with the intent to create the illusion of demand, deceive other market participants, and artificially move the market price higher.  One millisecond after Flaum placed the Manipulative Order to buy, the market price did in fact move higher, and Flaum's order to sell five gold futures contracts was executed in its entirety.  Approximately 1.123 seconds later, Flaum canceled his Manipulative Order in its entirety.

6.      Similarly, on January 19, 2010, at approximately 8:34:52.193 a.m. (CST), Trader 2 placed a genuine order to sell two gold futures contracts at the price of $1,134.00.  Trader 2 then placed a Manipulative Order to buy 110 gold futures contracts at the price of $1,133.80 with the intent to create the illusion of demand, deceive other market participants, and artificially move the market price higher.  Three milliseconds after Trader 2 placed the Manipulative Order to buy, the market price did in fact move higher, and Trader 2's order to sell two gold futures contracts was executed in its entirety.  Approximately 0.684 seconds later, Trader 2 canceled his Manipulative Order in its entirety.

7.      Further, on June 28, 2012, at approximately 6:15:29.111 a.m. (CST), Trader 3 placed a genuine iceberg order to sell three gold futures contracts at the price of $1,569.60.  Trader 3 then placed a Manipulative Order to buy 150 gold futures contracts at the price of $1,569.00 with the intent to create the illusion of demand, deceive other market participants, and artificially move the market price higher.  Twenty-one milliseconds after Trader 3 placed the Manipulative Order to buy, the market price did in fact move higher, and Trader 3's order to sell three gold futures contracts began to fill, and 43 milliseconds after Trader 3 placed the Manipulative Order, the order to sell was executed in its entirety.  Approximately 2.805 seconds later, Trader 3 canceled his Manipulative Order in its entirety.

A-3

8.      One or more of the Subject Traders also sometimes placed Manipulative Orders that were outside the top half of the visible order book (*i.e.*, more than five price levels away from the best bid or offer).  For example, on May 25, 2016, at approximately 11:16:43.047 a.m. (CST), Flaum placed a genuine order to buy three gold futures contracts at the price of $1,222.50. Approximately 10.208 seconds later, Flaum placed a Manipulative Order to sell 145 gold futures contracts at the price of $1,223.20 (which at the time was in the bottom half of the order book) with the intent to create the illusion of supply, deceive other market participants, and artificially move the market price lower.  Approximately 72 milliseconds later, the market price did in fact move lower, and Flaum's genuine order to buy was filled in its entirety.    Approximately 1.268 seconds later, Flaum canceled his Manipulative Order in its entirety.

9.      One or more of the Subject Traders also sometimes placed Manipulative Orders that lasted for a relatively long period of time.  For example, on May 25, 2016, at approximately 11:26:42.919 a.m. (CST), Flaum placed a genuine order to buy ten gold futures contracts at the price of $1,221.70.  Approximately 6.249 seconds later, Flaum placed a Manipulative Order to sell 145 gold futures contracts at the price of $1,222.20 with the intent to create the illusion of supply, deceive other market participants, and artificially move the market price lower.  One millisecond after Flaum placed the Manipulative Order to sell, the market price did in fact move lower, and Flaum's order to buy ten gold futures contracts was executed in full.  After the price continued to decrease, Flaum placed another genuine order to buy ten gold futures contracts at a price of $1,221.40.  After that buy order was executed in full, Flaum canceled his Manipulative Order in its entirety.  In total, the Manipulative Order was active for approximately 24.775 seconds.

10.      Further, on a few occasions, one or more of the Subject Traders placed Manipulative Orders that were intended to assist in the execution of genuine orders that were many

price levels away on the opposite side of the market.  For example, on August 22, 2011, at approximately 11:43:09.953 a.m. (CST), Flaum placed a Manipulative Order to buy 245 gold futures contracts at the price of $1,890.20 with the intent to create the illusion of demand, deceive other market participants, and artificially move the market price higher.  On the opposite side of the market Flaum had a genuine order to sell 25 gold futures contracts at $1,891.00 (placed approximately 12.862 seconds before the Manipulative Order), and Flaum placed additional genuine sell orders during the life of the Manipulative Order.  At the time of the Manipulative Order's placement, the genuine order to sell 25 contracts was 8 levels away from the Manipulative Order.  Approximately 1.561 seconds after Flaum placed the Manipulative Order, the market price did in fact move higher, and the genuine order was filled in its entirety.  Approximately 1.870 seconds after the genuine order execution, Flaum canceled the Manipulative Order in its entirety.

11.     In addition, Flaum and Trader 4 sometimes layered, or grouped, multiple Manipulative Orders.  In particular, Trader 4 placed groups of one-contract Manipulative Orders in close proximity to each other, typically opposite "iceberg" orders that Trader 4 intended to execute.  For example, on August 1, 2013, at approximately 1:20:21.133 a.m. (CST), Trader 4 placed two iceberg orders to buy a total of ten gold futures contracts at the price of $1,320.00.  Approximately 3.976 seconds later, Trader 4 began placing a series of one-contract Manipulative Orders to sell a total of 57 gold futures contracts at a price of $1,320.40 with the intent to create the illusion of supply, deceive other market participants, and artificially move the market price lower.  Shortly thereafter, the market price began to drop, Trader 4's genuine orders to buy were filled in their entirety, and Trader 4 canceled his 57 Manipulative Orders.  In total, the group of Manipulative Orders was active for approximately 14.909 seconds.

12.     The Manipulative Orders placed by the Subject Traders were transmitted electronically via international and interstate wire communications from outside the State of Illinois to computer servers operated by the CME Group in and around Chicago and Aurora, Illinois.

13.     In placing Manipulative Orders, the Subject Traders were acting within the scope of their employment as employees of the Company and with the intent, at least in part, to benefit the Company.

<u>Compliance Function and Internal Control Failures</u>

14.     During the Relevant Period, the Company's compliance function failed to detect or deter the Subject Traders' unlawful trading practices.  Moreover, three compliance officers had substantial information regarding, but failed to stop, unlawful trading by Trader 4 between August 2013 and February 2016.

15.     More specifically, on August 6, 2013, Compliance Officer 1 (who was a senior compliance officer in the Company's swap-dealer business and, among other duties, served as the primary compliance resource for the Company's precious metals business) distributed to various Company employees an email regarding the CFTC's guidance regarding prohibitions on disruptive trading practices under the Dodd-Frank Act, including the prohibition against spoofing.

16.     The same day, Trader 4 responded to Compliance Officer 1's email seeking clarification and providing substantial information regarding the nature of his trading, including by describing how he placed groups of one-contract orders on one side of the market to facilitate executions on the opposite side of the market.  Shortly thereafter, Compliance Officer 1 forwarded Trader 4's inquiry to Compliance Officer 2 (who was head of the Company's trade surveillance) and Compliance Officer 3 (who was a member of the trade surveillance team and a former trader).

A-6

17.     Notwithstanding the substantial information available to the compliance officers regarding Trader 4's unlawful trading activity, no compliance officer undertook further investigation of Trader 4's trading practices, provided further guidance or training, or otherwise followed up on Trader 4's inquiry.

18.     Following this email exchange with Compliance Officer 1 in August 2013, Trader 4 continued to place Manipulative Orders to buy and sell precious metals futures contracts into early 2016.  In February 2016, the Company's futures commission merchant ("FCM") flagged six instances of Trader 4's activity for possible spoofing.  In each instance, Trader 4 had placed groups of multiple one-contract orders opposite iceberg orders that were executed.

19.     In discussing internally how to respond to the Company's FCM, Compliance Officer 2 forwarded summaries of the six episodes to Compliance Officer 3: "Take a look at this… It's [Trader 4] in Hong Kong.  Pretty obvious, but want your thoughts on it[.]"

20.     Nevertheless, after further internal discussions, Compliance Officer 2 replied to the FCM that the Company had determined Trader 4's trading was not problematic: "[W]hat is being seen may look like potential layering or spoofing, but based on the fact [that] we are talking [about] 1 lots, we believe he is just adjusting his exposure to the marketplace."

21.     By failing to properly train the Company's precious metals traders, failing to correct Trader 4's known unlawful trading practices, misleading the Company's FCM about Trader 4's conduct, and failing to report Trader 4's conduct to the appropriate authorities, the Company's compliance personnel contributed to the offense conduct and undermined the control functions necessary to an effective compliance program.

22.     Relatedly, in approximately April 2016, Compliance Officer 2 falsely represented to the National Futures Association ("NFA"), the self-regulatory organization for the U.S.

A-7

derivatives industry, that the Company used sophisticated algorithmic trade surveillance tools to identify spoofing and other manipulative trading practices.  The existence of such tools was important to the NFA's assessment of the Company's internal controls.  At that time, however, the Company did not utilize such surveillance tools as part of its trade surveillance program.

23.     Shortly thereafter, in April 2016, the Company terminated Compliance Officers 2 and 3 for reasons unrelated to the conduct discussed above.  After their departure, the Company's FCM flagged Flaum's trading for possible spoofing, new compliance officers at the Company identified and escalated the trading, and the Company made a self-disclosure to the CFTC.

**ATTACHMENT B**

**CERTIFICATE OF CORPORATE RESOLUTIONS**

I, Julie Ann Walsh, Senior Vice President, Corporate Secretary and Chief Corporate Governance Officer of The Bank of Nova Scotia, do hereby certify the following to be a true and correct copy of a resolution duly passed by the Board of Directors of The Bank of Nova Scotia at their meeting held in Toronto, Ontario on August 12, 2020:

"WHEREAS, The Bank of Nova Scotia (the "Company") has been engaged in discussions with the United States Department of Justice, Criminal Division, Fraud Section, and the United States Attorney's Office for the District of New Jersey (collectively, the "Fraud Section and the Office") regarding issues arising in relation to unlawful commodities trading activity by Company employees; and

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into a certain agreement with the Fraud Section and the Office (the "Agreement" or "Deferred Prosecution Agreement"); and

WHEREAS, the Company's Executive Vice President and General Counsel for the Company, Ian Arellano, together with outside counsel for the Company, have advised the Board of Directors of the Company of its rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into such agreement with the Fraud Section and the Office;

Therefore, the Board of Directors unanimously RESOLVES that:

1.     The Company (a) acknowledges the filing of the two-count Information charging the Company with wire fraud, in violation of Title 18, United States Code, Section 1343, and

2

attempted price manipulation, in violation of Title 7, United States Code, Section 13(a)(2); (b) waives indictment on such charges and enters into a deferred prosecution agreement with the Fraud Section and the Office; and (c) agrees to pay a Total Criminal Monetary Amount of $60,451,102 under the Agreement with respect to the conduct described in the Information;

2.     The Company accepts the terms and conditions of this Agreement, including, but not limited to, (a) a knowing waiver of its rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) a knowing waiver for purposes of this Agreement and any charges by the United States arising out of the conduct described in the attached Statement of Facts of any objection with respect to venue and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the District of New Jersey; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the attached Statement of Facts or relating to conduct known to the Fraud Section and the Office prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement;

3.     The Executive Vice President and General Counsel of the Company, Ian Arellano, is hereby authorized, empowered and directed, on behalf of the Company, to execute the Deferred Prosecution Agreement substantially in such form as reviewed by this Board of Directors at this meeting with such changes as the Executive Vice President and General Counsel of Company, Ian Arellano, may approve;

4.     The Executive Vice President and General Counsel of the Company, Ian Arellano, is hereby authorized, empowered and directed to take any and all actions as may be necessary or

3

appropriate and to approve the forms, terms or provisions of any agreement or other documents as

may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing

resolutions; and

     5.    All of the actions of the Executive Vice President and General Counsel of the

Company, Ian Arellano, which actions would have been authorized by the foregoing resolutions

except that such actions were taken prior to the adoption of such resolutions, are hereby severally

ratified, confirmed, approved, and adopted as actions on behalf of the Company."

 

_Julie Walsh_
Senior Vice President, Corporate Secretary
and Chief Corporate Governance Officer

DATED at Toronto, Ontario
this 12th day of August, 2020

B.N.S. Document
No. 225/20
Approved for
Execution  MC

**Attachment C**

## CORPORATE COMPLIANCE PROGRAM

In order to address any deficiencies in its internal controls, compliance code, policies, and procedures relating to conduct in violation of (i) the Commodity Exchange Act, Title 7, United States Code, Sections 1, *et seq.*; (ii) as it applies to commodities trading, the wire fraud statute, Title 18, United States Code, Section 1343; and (iii) the commodities fraud statute, Title 18, United States Code, Section 1348 (collectively, the "Commodities Laws"), The Bank of Nova Scotia (the "Company"), on behalf of itself and its subsidiaries and affiliates, agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its existing internal controls, policies, and procedures.

Where necessary and appropriate, the Company agrees to adopt new, or to modify its existing, compliance program, including internal controls, compliance policies, and procedures in order to ensure that it maintains an effective compliance program that is designed to effectively deter and detect violations of the Commodities Laws.  At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of the Company's existing internal controls, compliance code, policies, and procedures:

*Commitment to Compliance*

1.      The Company will ensure that its directors and senior management provide strong, explicit, and visible support and commitment to its corporate policy against violations of the Commodities Laws and its compliance codes, and demonstrate rigorous adherence by example. The Company will also ensure that middle management, in turn, reinforce those standards and encourage employees to abide by them.  The Company will create and foster a culture of ethics and compliance with the law in its day-to-day operations at all levels of the company.

C-1

*Policies and Procedures*

2.       The Company will develop and promulgate clearly articulated and visible corporate policies against violations of the Commodities Laws, which policies shall be memorialized in a written compliance code.

3.       The Company will develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of the Commodities Laws and the Company's compliance code, and the Company will take appropriate measures to encourage and support the observance of ethics and compliance policies and procedures against violation of the Commodities Laws by personnel at all levels of the Company.  These policies and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of the company, including, but not limited to, agents, consultants, and joint venture partners (collectively, "agents and business partners").  The Company shall notify all employees that compliance with the policies and procedures is the duty of individuals at all levels of the Company.

*Periodic Risk-Based Review*

4.       The Company will develop these compliance policies and procedures on the basis of a periodic risk assessment addressing the individual circumstances of the Company.

5.       The Company shall review its compliance policies and procedures regarding the Commodities Laws no less than annually and update them as appropriate to ensure their continued effectiveness, taking into account relevant developments in the field and evolving industry standards.

*Proper Oversight and Independence*

6.       The Company will assign responsibility to one or more senior corporate executives of the Company for the implementation and oversight of the Company's compliance code, policies,

and procedures regarding the Commodities Laws.  Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including internal audit, the Company's Board of Directors, or any appropriate committee of the Board of Directors, and shall have an adequate level of stature and autonomy from management as well as sufficient resources and authority to maintain such autonomy.

*Training and Guidance*

7.     The Company will implement mechanisms designed to ensure that its compliance code, policies, and procedures regarding the Commodities Laws are effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners.  These mechanisms shall include:  (a) periodic training for all directors and officers, all employees in positions of leadership or trust, all commodities traders, any positions that require such training (*e.g.*, internal audit, sales, legal, compliance, finance), and, where necessary and appropriate, agents and business partners; and (b) corresponding certifications by all such directors, officers, employees, commodities traders, agents and business partners, certifying compliance with the training requirements.  The Company will conduct training in a manner tailored to the audience's size, sophistication, or subject matter expertise and, where appropriate, will discuss prior compliance incidents.

8.     The Company will maintain, or where necessary establish, an effective system for providing guidance and advice to directors, officers, employees, commodities traders, and, where necessary and appropriate, agents and business partners, on complying with the Company's compliance code, policies, and procedures regarding the Commodities Laws, including when they need advice on an urgent basis.

C-3

*Internal Reporting and Investigation*

9.      The Company will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners concerning violations of the Commodities Laws or the Company's compliance code, policies, and procedures regarding the Commodities Laws.

10.      The Company will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of the Commodities Laws or the Company's compliance code, policies, and procedures regarding the Commodities Laws.  The Company will handle the investigations of such complaints in an effective manner, including routing the complaints to proper personnel, conducting timely and thorough investigations, and following up with appropriate discipline where necessary.

*Enforcement and Discipline*

11.      The Company will implement mechanisms designed to effectively enforce its compliance code, policies, and procedures, including appropriately incentivizing compliance and disciplining violations.

12.      The Company will institute appropriate disciplinary procedures to address, among other things, violations of the Commodities Laws and the Company's compliance code, policies, and procedures regarding the Commodities Laws by the Company's directors, officers, and employees.  Such procedures should be applied consistently and fairly, and in a manner consistent with the violation, regardless of the position held by, or perceived importance of, the director, officer, or employee.  The Company shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and

C-4

to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, compliance code, policies, and procedures and making modifications necessary to ensure the overall compliance program regarding the Commodities Laws is effective.

*Mergers and Acquisitions*

13.     The Company will develop and implement policies and procedures for mergers and acquisitions requiring that the Company conduct appropriate risk-based due diligence on potential new business entities, including appropriate due diligence regarding the Commodities Laws by legal, accounting, and compliance personnel.

14.     The Company will ensure its compliance code, policies, and procedures regarding the Commodities Laws apply as quickly as is practicable to newly-acquired businesses or entities merged with the Company and will promptly (a) train the directors, officers, employees, commodities traders, agents, and business partners consistent with Paragraphs 7-8; and (b) where warranted, conduct an audit of all newly acquired or merged businesses as quickly as is practicable concerning compliance with the Commodities Laws.

*Monitoring, Testing, and Remediation*

15.     In order to ensure that its compliance program does not become stale, the Company will conduct periodic reviews and testing of its compliance code, policies, and procedures regarding the Commodities Laws designed to evaluate and improve their effectiveness in preventing and detecting violations of Commodities Laws and the Company's code, policies, and procedures regarding the Commodities Laws, taking into account relevant developments in the field and evolving industry standards.  The Company will ensure that compliance and control personnel have sufficient direct or indirect access to relevant sources of data to allow for timely and effective monitoring and/or testing.  Based on such review and testing and its analysis of any

prior misconduct, the Company will conduct a thoughtful root cause analysis and timely and appropriately remediate to address the root causes.

16.     The Company will maintain, or where necessary establish, an effective trade surveillance program capable of detecting trading activity that has indicia of fraudulent, manipulative, or otherwise unlawful conduct.

**Attachment D**

**INDEPENDENT COMPLIANCE MONITOR**

The duties and authority of the Independent Compliance Monitor (the "Monitor"), and the obligations of The Bank of Nova Scotia (the "Company"), on behalf of itself and its subsidiaries and affiliates, with respect to the Monitor and the United States Department of Justice, Criminal Division, Fraud Section ("Fraud Section"), and the United States Attorney's Office for the District of New Jersey ("Office") (collectively, the "Fraud Section and the Office"), are as described below:

1.      The Company will retain the Monitor for a period of three years (the "Term of the Monitorship"), unless the early termination provision of Paragraph 3 of the Deferred Prosecution Agreement (the "Agreement") is triggered.

*Monitor's Mandate*

2.      The Monitor's primary responsibility is to assess and monitor the Company's compliance with the terms of the Agreement, including the Corporate Compliance Program in Attachment C, so as to specifically address and reduce the risk of any recurrence of the Company's misconduct.  During the Term of the Monitorship, the Monitor will evaluate, in the manner set forth below, the effectiveness of the Company's internal controls, compliance policies, and procedures as they relate to the Company's current and ongoing compliance with (i) the Commodity Exchange Act, Title 7, United States Code, Section 1, *et seq.*; (ii) as it applies to commodities trading, the wire fraud statute, Title 18, United States Code, Section 1343; and (iii) the commodities fraud statute, Title 18, United States Code, Section 1348 (collectively, the "Commodities Laws"), and take such reasonable steps as, in his or her view, may be necessary to fulfill the foregoing mandate (the "Mandate").  This Mandate shall include an assessment of the

Board of Directors' and senior management's commitment to, and effective implementation of, the corporate compliance program described in Attachment C of the Agreement.

*Company's Obligations*

3.     The Company shall cooperate fully with the Monitor, and the Monitor shall have the authority to take such reasonable steps as, in his or her view, may be necessary to be fully informed about the Company's compliance program in accordance with the principles set forth herein and subject to applicable law, including applicable data protection and labor laws and regulations.  To that end, the Company shall: facilitate the Monitor's access to the Company's documents and resources; not limit such access, except as provided in Paragraphs 5-6; and provide guidance on applicable local law (such as relevant data protection and labor laws).  The Company shall provide the Monitor with access to all information, documents, records, facilities, and employees, as reasonably requested by the Monitor, that fall within the scope of the Mandate of the Monitor under the Agreement.  The Company shall use its best efforts to provide the Monitor with access to the Company's former employees and its third-party vendors, agents, and consultants.

4.     Any disclosure by the Company to the Monitor concerning violations of the Commodities Laws shall not relieve the Company of any otherwise applicable obligation to truthfully disclose such matters to the Fraud Section and the Office, pursuant to the Agreement.

*Withholding Access*

5.     The parties agree that no attorney-client relationship shall be formed between the Company and the Monitor.  In the event that the Company seeks to withhold from the Monitor access to information, documents, records, facilities, or current or former employees of the

Company that may be subject to a claim of attorney-client privilege or to the attorney work-product doctrine, or where the Company reasonably believes production would otherwise be inconsistent with applicable law, the Company shall work cooperatively with the Monitor to resolve the matter to the satisfaction of the Monitor.

6.      If the matter cannot be resolved, at the request of the Monitor, the Company shall promptly provide written notice to the Monitor, the Fraud Section, and the Office.  Such notice shall include a general description of the nature of the information, documents, records, facilities, or current or former employees that are being withheld, as well as the legal basis for withholding access.  The Fraud Section and the Office may then consider whether to make a further request for access to such information, documents, records, facilities, or employees.

*Monitor's Coordination with the
Company and Review Methodology*

7.      In carrying out the Mandate, to the extent appropriate under the circumstances, the Monitor should coordinate with Company personnel, including in-house counsel, compliance personnel, and internal auditors, on an ongoing basis.  The Monitor may rely on the product of the Company's processes, such as the results of studies, reviews, sampling and testing methodologies, audits, and analyses conducted by or on behalf of the Company, as well as the Company's internal resources (*e.g.*, legal, compliance, and internal audit), which can assist the Monitor in carrying out the Mandate through increased efficiency and Company-specific expertise, provided that the Monitor has confidence in the quality of those resources.

8.      The Monitor's reviews should use a risk-based approach, and thus, the Monitor is not expected to conduct a comprehensive review of all business lines, all business activities, or all markets.  In carrying out the Mandate, the Monitor should consider, for instance, risks presented

by: (a) the particular markets in which the Company trades; (b) the types of financial products and services, including the particular commodities, traded by the Company; (c) the status and strength of the Company's detective controls, including but not limited to, the Company's trade surveillance and electronic communications surveillance systems; (d) the number, type, and frequency of surveillance alerts that have been triggered by an individual trader or by multiple traders on a particular trading desk and how the Company has handled those alerts; and (e) the sufficiency of the personnel and resources within the compliance function.

9.      In undertaking the reviews to carry out the Mandate, the Monitor shall formulate conclusions based on, among other things:  (a) inspection of relevant documents, including the Company's current policies and procedures regarding the Commodities Laws; (b) on-site observation of selected systems and procedures of the Company at sample sites, including trade surveillance, record-keeping, and internal audit procedures; (c) meetings with, and interviews of, relevant current and, where appropriate, former directors, officers, employees, business partners, agents, and other persons at mutually convenient times and places; and (d) analyses, studies, and testing of the Company's compliance program.

*Monitor's Written Work Plans*

10.      To carry out the Mandate, during the Term of the Monitorship, the Monitor shall conduct an initial review and prepare an initial report, followed by at least two follow-up reviews and reports as described in Paragraphs 16-19 below.  With respect to the initial report, after consultation with the Company, the Fraud Section, and the Office, the Monitor shall prepare the first written work plan within sixty (60) calendar days of being retained, and the Company, the Fraud Section, and the Office shall provide comments within thirty (30) calendar days after receipt

of the written work plan.  With respect to each follow-up report, after consultation with the Company, the Fraud Section, and the Office, the Monitor shall prepare a written work plan at least thirty calendar days prior to commencing a review, and the Company, the Fraud Section, and the Office shall provide comments within twenty calendar days after receipt of the written work plan. Any disputes between the Company and the Monitor with respect to any written work plan shall be decided by the Fraud Section and the Office in their sole discretion.

11.    All written work plans shall identify with reasonable specificity the activities the Monitor plans to undertake in execution of the Mandate, including a written request for documents. The Monitor's work plan for the initial review shall include such steps as are reasonably necessary to conduct an effective initial review in accordance with the Mandate, including by developing an understanding, to the extent the Monitor deems appropriate, of the facts and circumstances surrounding any violations of the Commodities Laws that may have occurred before the date of the Agreement.  In developing such understanding, the Monitor is to rely, to the extent possible, on available information and documents provided by the Company.  It is not intended that the Monitor will conduct his or her own inquiry into the historical events that gave rise to the Agreement.

*Initial Review*

12.    The initial review shall commence no later than one hundred twenty (120) calendar days from the date of the engagement of the Monitor (unless otherwise agreed by the Company, the Monitor, the Fraud Section, and the Office).  The Monitor shall issue a written report within one hundred fifty (150) calendar days of commencing the initial review, setting forth the Monitor's assessment and, if necessary, making recommendations reasonably designed to improve the

effectiveness of the Company's program for ensuring compliance with the Commodities Laws. The Monitor should consult with the Company concerning his or her findings and recommendations on an ongoing basis and should consider the Company's comments and input to the extent the Monitor deems appropriate.  The Monitor may also choose to share a draft of his or her reports with the Company prior to finalizing them.  The Monitor's reports need not recite or describe comprehensively the Company's history or compliance policies, procedures and practices, but rather may focus on those areas with respect to which the Monitor wishes to make recommendations, if any, for improvement or which the Monitor otherwise concludes merit particular attention.  The Monitor shall provide the report to the Board of Directors of the Company and contemporaneously transmit copies to Brian Kidd, Deputy Chief, Fraud Section, Criminal Division, U.S. Department of Justice, at 1400 New York Avenue N.W., Bond Building, Eleventh Floor, Washington, D.C. 20005, and to Courtney A. Howard, Chief, Economic Crimes Unit, U.S. Attorney's Office for the District of New Jersey, at Peter W. Rodino, Jr. Federal Building, 970 Broad Street, Newark, NJ 07102.  After consultation with the Company, the Monitor may extend the time period for issuance of the initial report for a brief period of time with prior written approval of the Fraud Section and the Office.

13. Within one hundred fifty (150) calendar days after receiving the Monitor's initial report, the Company shall adopt and implement all recommendations in the report, unless, within sixty (60) calendar days of receiving the report, the Company notifies in writing the Monitor, the Fraud Section, and the Office of any recommendations that the Company considers unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable.  With respect to any such recommendation, the Company need not adopt

that recommendation within the one hundred fifty (150) calendar days of receiving the report but shall propose in writing to the Monitor, the Fraud Section, and the Office an alternative policy, procedure, or system designed to achieve the same objective or purpose.  As to any recommendation on which the Company and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within forty-five (45) calendar days after the Company serves the written notice.

14.     In the event the Company and the Monitor are unable to agree on an acceptable alternative proposal, the Company shall promptly consult with the Fraud Section and the Office. The Fraud Section and the Office may consider the Monitor's recommendation and the Company's reasons for not adopting the recommendation in determining whether the Company has fully complied with its obligations under the Agreement.  Pending such determination, the Company shall not be required to implement any contested recommendation(s).

15.     With respect to any recommendation that the Monitor determines cannot reasonably be implemented within one hundred fifty (150) calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the Fraud Section and the Office.

*Follow-Up Reviews*

16.     A follow-up review shall commence no later than one hundred eighty (180) calendar days after the issuance of the initial report (unless otherwise agreed by the Company, the Monitor, the Fraud Section, and the Office).  The Monitor shall issue a written follow-up report within one hundred twenty (120) calendar days of commencing the follow-up review, setting forth the Monitor's assessment and, if necessary, making recommendations in the same fashion as set

forth in Paragraph 12 with respect to the initial review.  After consultation with the Company, the Monitor may extend the time period for issuance of the follow-up report for a brief period of time with prior written approval of the Fraud Section and the Office.

17.     Within one hundred twenty (120) calendar days after receiving the Monitor's follow-up report, the Company shall adopt and implement all recommendations in the report, unless, within thirty (30) calendar days after receiving the report, the Company notifies in writing the Monitor, the Fraud Section, and the Office concerning any recommendations that the Company considers unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable.  With respect to any such recommendation, the Company need not adopt that recommendation within one hundred twenty (120) calendar days of receiving the report but shall propose in writing to the Monitor, the Fraud Section, and the Office an alternative policy, procedure, or system designed to achieve the same objective or purpose.  As to any recommendation on which the Company and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within thirty (30) calendar days after the Company serves the written notice.

18.     In the event the Company and the Monitor are unable to agree on an acceptable alternative proposal, the Company shall promptly consult with the Fraud Section and the Office. The Fraud Section and the Office may consider the Monitor's recommendation and the Company's reasons for not adopting the recommendation in determining whether the Company has fully complied with its obligations under the Agreement.  Pending such determination, the Company shall not be required to implement any contested recommendation(s).  With respect to any recommendation that the Monitor determines cannot reasonably be implemented within one

hundred twenty (120) calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the Fraud Section and the Office.

19.     The Monitor shall undertake a second follow-up review not later than one hundred fifty (150) calendar days after the issuance of the first follow-up report.  The Monitor shall issue a second follow-up report within one hundred twenty (120) days of commencing the review, and recommendations shall follow the same procedures described in Paragraphs 16-18.  Following the second follow-up review, the Monitor shall certify whether the Company's compliance program, including its policies and procedures and internal controls, is reasonably designed and implemented to prevent and detect violations of the Commodities Laws.  The final follow-up review and report shall be completed and delivered to the Fraud Section and the Office no later than thirty (30) days before the end of the Term.

*Monitor's Discovery of Potential or Actual Misconduct*

20.     (a)     Except as set forth below in sub-paragraphs (b), (c) and (d), should the Monitor discover during the course of his or her engagement that:

- Any person within the Company may have engaged in unlawful trading activity in violation of the Commodities Laws, including market manipulation, insider trading, price manipulation, or spoofing (*i.e.*, placing orders with the intent to cancel before execution)

(collectively, "Potential Misconduct"), the Monitor shall immediately report the Potential Misconduct to the Company's General Counsel, Chief Compliance Officer, and/or Audit Committee for further action, unless the Potential Misconduct was already so disclosed.  The Monitor also may report Potential Misconduct to the Fraud Section and the Office at any time, and

shall report Potential Misconduct to the Fraud Section and the Office when they request the information.

(b)     In some instances, the Monitor should immediately report Potential Misconduct directly to the Fraud Section and the Office, and not to the Company.  The presence of any of the following factors militates in favor of reporting Potential Misconduct directly to the Fraud Section and the Office, and not to the Company, namely, where the Potential Misconduct: (1) poses a risk to public health or safety or the environment; (2) involves senior management of the Company; (3) involves obstruction of justice; or (4) otherwise poses a substantial risk of harm.

(c)     If the Monitor believes that any Potential Misconduct actually occurred or may constitute a criminal or regulatory violation ("Actual Misconduct"), the Monitor shall immediately report the Actual Misconduct to the Fraud Section and the Office.  When the Monitor discovers Actual Misconduct, the Monitor shall disclose the Actual Misconduct solely to the Fraud Section and the Office, and, in such cases, disclosure of the Actual Misconduct to the General Counsel, Chief Compliance Officer, and/or the Audit Committee of the Company should occur as the Fraud Section, the Office, and the Monitor deem appropriate under the circumstances.

(d)     The Monitor shall address in his or her reports the appropriateness of the Company's response to disclosed Potential Misconduct or Actual Misconduct, whether previously disclosed to the Fraud Section and the Office or not.  Further, if the Company or any entity or person working directly or indirectly for or on behalf of the Company withholds information necessary for the performance of the Monitor's responsibilities and the Monitor believes that such withholding is without just cause, the Monitor shall also immediately disclose that fact to the Fraud

Section and the Office and address the Company's failure to disclose the necessary information in his or her reports.

(e)    The Company nor anyone acting on its behalf shall take any action to retaliate against the Monitor for any such disclosures or for any other reason.

*Meetings During Pendency of Monitorship*

21.    The Monitor shall meet with the Fraud Section and the Office within thirty calendar days after providing each report to the Fraud Section and the Office to discuss the report, to be followed by a meeting between the Fraud Section, the Office, the Monitor, and the Company.

22.    At least annually, and more frequently if appropriate, representatives from the Company, the Fraud Section, and the Office will meet together to discuss the monitorship and any suggestions, comments, or improvements the Company may wish to discuss with or propose to the Fraud Section and the Office, including with respect to the scope or costs of the monitorship.

*Contemplated Confidentiality of Monitor's Reports*

23.    The reports will likely include proprietary, financial, confidential, and competitive business information.  Moreover, public disclosure of the reports could discourage cooperation, or impede pending or potential government investigations and thus undermine the objectives of the monitorship.  For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent that the Fraud Section and the Office determine in their sole discretion that disclosure would be in furtherance of the Fraud Section and the Office's discharge of their duties and responsibilities or is otherwise required by law.

D-11

**ATTACHMENT E**

**CERTIFICATION**

To:   United States Department of Justice          United States Attorney's Office
      Criminal Division, Fraud Section             District of New Jersey
      Attention: Robert A. Zink, Chief             Attention: Craig Carpenito, U.S. Attorney

Re:   Deferred Prosecution Agreement Disclosure Certification

The undersigned certify, pursuant to Paragraph 31 of the Deferred Prosecution Agreement ("DPA") filed on August 19, 2020 in the U.S. District Court for the District of New Jersey, by and between the United States and The Bank of Nova Scotia (the "Company"), that undersigned are aware of the Company's disclosure obligations under Paragraph 6 of the DPA and that the Company has disclosed to the United States Department of Justice, Criminal Division, Fraud Section and to the United States Attorney's Office for the District of New Jersey (collectively, the "Fraud Section and the Office") any and all evidence or allegations of conduct required pursuant to Paragraph 6 of the DPA, which includes evidence or allegations of conduct that may constitute a violation of (i) the Commodity Exchange Act, Title 7, United States Code, Section 1, *et seq.*; (ii) as it applies to commodities trading, the wire fraud statute, Title 18, United States Code, Section 1343; or (iii) the commodities fraud statute, Title 18, United States Code, Section 1348 ("Disclosable Information").  This obligation to disclose information extends to any and all Disclosable Information that has been identified through the Company's compliance and controls program, whistleblower channel, internal audit reports, due diligence procedures, investigation process, or other processes.  The undersigned further acknowledge and agree that the reporting requirement contained in Paragraph 6 and the representations contained in this certification constitute a significant and important component of the DPA and of the Fraud Section and the Office's determination whether the Company has satisfied its obligations under the DPA.

E-1

The undersigned hereby certify respectively that [he/she] is the Chief Executive Officer of the Company and that [he/she] is the Chief Financial Officer of the Company and that each has been duly authorized by the Company to sign this Certification on behalf of the Company.

This Certification shall constitute a material statement and representation by the undersigned and by, on behalf of, and for the benefit of, the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and such material statement and representation shall be deemed to have been made in the District of New Jersey.  This Certification shall also constitute a record, document, or tangible object in connection with a matter within the jurisdiction of a department and agency of the United States for purposes of 18 U.S.C. § 1519, and such record, document, or tangible object shall be deemed to have been made in the District of New Jersey.

By: _____          Dated: _____

    Chief Executive Officer
    The Bank of Nova Scotia

By: _____          Dated: _____

    Chief Financial Officer
    The Bank of Nova Scotia